# UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

and

DANEASHA DAVIS,

    Plaintiff-Intervenor,

v.

KANSAS CITY, KANSAS HOUSING AUTHORITY, VICTOR L. HERNANDEZ, DERRICK ESTELLE, SR., and RONALD D. COBB,

    Defendants.

Civil No. 2:15-cv-09352-JAR-TJJ

## SECOND AMENDED COMPLAINT AND JURY DEMAND

The United States of America ("United States") alleges as follows:

## NATURE OF THE ACTION

1. This action is brought by the United States to enforce Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 ("Fair Housing Act"), 42 U.S.C. §§ 3601-3631. It is brought pursuant to 42 U.S.C. § 3612(o) on behalf of Daneasha Davis against Defendants Kansas City, Kansas Housing Authority ("KCKHA") and Victor L. Hernandez, and on behalf of Autumn Weaver against Defendant Victor L. Hernandez,[1] and pursuant to 42 U.S.C. § 3614(a) against all Defendants.

---

[1] Weaver and KCKHA entered into a conciliation agreement on August 3, 2015, which fully resolved her complaint against KCKHA.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 3612(o)(1) and 3614(a).

3. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the United States' claim occurred there.

4. Defendants KCKHA, Hernandez, Estelle, and Cobb reside in this District.

## THE PARTIES

5. KCKHA operates and manages Kansas City's public housing program and administers the United States Department of Housing and Urban Development's ("HUD") Housing Choice Voucher Program in Kansas City. The housing authority was created pursuant to Kansas law by the municipality of the Unified Government of Wyandotte County and Kansas City, Kansas. KCKHA is located in the District of Kansas.

6. At all times relevant to this action, Hernandez was the Administrative Coordinator and Hearing Officer for the KCKHA. Hernandez was employed in that capacity by KCKHA from October 19, 2009, to January 6, 2014.

7. At all times relevant to this action, Estelle was a Property Manager in the KCKHA Housing Management Department. Estelle was employed in this capacity by KCKHA from February 20, 2003 to January 29, 2016.

8. At all times relevant to this action, Cobb was the Director of the KCKHA Housing Management Department. Cobb was employed by KCKHA from October 11, 1977 to May 30, 2014.

9. At all times relevant to this action, Daneasha Davis (formerly Conner) was a single woman residing in Kansas City, Kansas with her four minor children. She and two of her children applied for and were eventually admitted into KCKHA's public housing program.

10. At all times relevant to this action, Autumn Weaver (formerly Smith) and her three minor children were participants in the KCKHA public housing program, residing in a public housing unit operated by KCKHA in Kansas City, Kansas.

## ALLEGATIONS OF SEXUAL HARASSMENT

11. KCKHA manages approximately 2,000 units of public housing in Kansas City.

12. The units managed by KCKHA are "dwellings" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b).

13. KCKHA has an Admissions & Continued Occupancy Policy ("ACOP") that establishes guidelines for KCKHA employees to follow in determining eligibility for admission and continued occupancy in Kansas City, Kansas public housing.

14. The ACOP sets forth an appeals hearing procedure for public housing applicants who disagree with a denial of admission to the public housing program, and a grievance hearing procedure for public housing participants who disagree with KCKHA determinations regarding their tenancy. At all times relevant to this action, KCKHA designated its employee Victor L. Hernandez to act as the hearings officer for appeals hearings and grievance hearings.

15. KCKHA permitted Hernandez to conduct these hearings by himself in his office behind closed doors. Hernandez's office was located in KCKHA's main administration building.

16. At all times relevant to this action, KCKHA provided Hernandez with the actual or apparent authority to make decisions on behalf of KCKHA on an applicant's admission to the public housing program and on a participant's continued occupancy in public housing.

17. At all times relevant to this action, KCKHA did not provide any specific mechanism for public housing applicants or participants to report sexual harassment by KCKHA employees, or provide any training or education to public housing applicants or participants about what to do in response to incidents of sexual harassment by KCKHA employees.

## **Sexual Harassment of Daneasha Davis by Hernandez**

18. Davis applied for public housing in early April 2012 and attended an appeals hearing with Hernandez after she was denied admission. At the hearing, Hernandez told Davis he was upholding the denial, but told her that if she "stayed out of trouble" for one year and re-applied, her chances of admission would be better.

19. Davis applied again for public housing with KCKHA on May 1, 2013, and received a denial letter dated May 28, 2013. Davis again requested an appeals hearing about her eligibility for public housing.

20. Davis attended an appeals hearing with Hernandez on June 11, 2013, in his office. Hernandez did not make a decision on her appeal at that time.

21. Around July 18, 2013, Davis, who had not received a decision over a month after her hearing, went to Hernandez's office and met with him to check on the status of her denial. During the meeting, Hernandez indicated he was not sure she was ready to be part of the public housing community. She responded that she was working, had not been in trouble, and needed the housing. Hernandez told Davis that due to her persistence, he would give her one more chance and that she would get a letter in the mail overturning the denial. Davis was overjoyed and as she was leaving the office, she told him, "Thank you, Mr. Hernandez, so much for overturning my denial. I really appreciate it. If I could give you a really big hug, I would. Thank you. God bless you and have a nice day," or words to that effect.

22. Hernandez called Davis later that day. He asked her how "happy" she was that he was overturning the denial and she responded that she was "very happy" and thanked him. He then stated, "Remember the hug you mentioned, I want to take you up on that hug," or words to that effect. Davis did not respond.

23. A few days later, Davis received a hearing decision letter from Hernandez dated July 18, 2013, titled "Review of Ineligibility Determination." The top of the letter had a box stating "Overturned" that was checked, but the text of the letter included a sentence that stated, "It is my opinion that Ms. Conner is not ready to become a positive part of a KCKHA community."

24. Davis was confused about the inconsistency in the letter and the status of her admission to the public housing program. On July 22, 2013, she called KCKHA to check the status of her application. A KCKHA employee who answered the phone told Davis her application had not been overturned. Davis then spoke with Hernandez, and he told her to come by his office.

25. On July 23, 2013, Davis met with Hernandez in his office and told him she wanted to discuss the inconsistency in the July 18, 2013, letter. Instead of responding to her, Hernandez asked her about a friend of hers and moved his computer screen to show her he had been looking at pictures of Davis on her Facebook page. Hernandez told her that her pictures were "sexy" and asked about her relationship with her fiancé. He then made sexually explicit comments about her pictures arousing him and rubbed his genitals. Davis did not know what to do or say, so she stayed in her seat.

26. Hernandez then unzipped his pants, exposed himself to her, and asked her inappropriate and offensive sexual questions about men's genitalia. He started to masturbate in front of Davis, made noises, and continued making unwelcome and offensive sexual statements. He asked her if she had any nude pictures on her Facebook page or cell phone and she told him no.

27. Davis was shocked, embarrassed, and nervous, and did not know what to do. She did not tell Hernandez to stop because she was hoping and waiting for Hernandez to correct the letter and give her official confirmation that her denial had been overturned.

28. In an effort to get Hernandez to focus on her letter, Davis told Hernandez that she needed to go to work and that she was there to get the decision letter corrected. He looked at the letter

and told her the inconsistent sentence was a mistake and that he would correct the letter and mail it to her. As Davis was leaving, Hernandez said, "I would ask for that hug, but I would want more than just the hug," or words to that effect.

29. On July 24, 2013, Hernandez mailed Davis a corrected letter that overturned her denial and did not include the inconsistent sentence. He attached a handwritten post-it note that stated, "Here is the corrected copy of your approval letter. Call me anytime there is something you need."

30. KCKHA updated Davis's application status on July 24, 2013, and placed Davis on the waiting list for a three-bedroom unit based on her application date of May 1, 2013. Until this date, KCKHA had treated Davis's application as denied.

31. KCKHA contacted Davis about an available unit on July 30, 2013. On the same day, Hernandez called Davis to inquire whether she had secured a public housing unit.

32. Davis signed a lease for a public housing unit on August 5, 2013.

33. On August 5, 2013, Davis visited Hernandez's office and used her cell phone to record the conversation.

34. During the August 5, 2013, meeting, Hernandez again made unwelcome sexual statements about Davis arousing him, asked Davis explicit sexual questions, exposed himself, and started touching himself in front of her. He showed Davis a pornographic video on his phone and he also referenced exposing himself to Davis in their previous meeting in July. He told Davis it was okay to look and asked if she wanted to do more than look. Towards the end of this encounter, he told Davis to call him if she wanted to engage with him sexually.

35. Later in August 2013, Davis answered a call from the KCKHA main number. The caller did not speak, but breathed heavily into the phone, making the same noises Hernandez did when he masturbated in front of her.

36. In September 2013, Hernandez called Davis again to inquire whether she had secured a public housing unit.

37. Hernandez implicitly conditioned the outcome of Davis's appeals hearing and housing application on her enduring his sexual conduct during the meetings in his office and/or otherwise engaging in sexual conduct with him.

38. Hernandez's sexual conduct towards Davis was unwelcome and offensive, and was sufficiently severe or pervasive to have the effect of imposing different terms, conditions, or privileges of her housing arrangement with the KCKHA and interfering with her enjoyment of housing.

### **Sexual Harassment of Autumn Weaver by Hernandez**

39. Weaver was admitted to KCKHA public housing on May 24, 2012. During 2013, Weaver was assessed maintenance fees and other charges by KCKHA totaling over $500.

40. On August 5, 2013, KCKHA filed a Petition and Complaint for Peaceable Entry and Forcible Detainer against Weaver in the District Court of Wyandotte County, Kansas. On or about August 7, 2013, Weaver received notice that KCKHA had filed the petition to evict her for unpaid rent and fees. She disputed that she owed some of the maintenance fees and spoke to Derrick Estelle, who was the property manager of her housing complex. Estelle told her to contact Hernandez about the maintenance charges.

41. On August 14, 2013, Weaver met with Hernandez in his office at KCKHA to have an informal grievance hearing about the maintenance fees that KCKHA had charged her.

42. During this meeting, Weaver answered a phone call from her fiancé and told him she would call him back. After she ended the call, Hernandez asked if she was single and if she would get involved with a married man. Weaver told him no to both questions.

43. Hernandez left the office to retrieve her maintenance file. When he returned, he shut the door to his office and stopped and stood next to her. She could see that he was trying to look down her shirt so she pulled up the top of her shirt.

44. Hernandez then showed Weaver a pornographic video he was viewing on his cell phone and asked her additional explicit sexual questions. Hernandez also showed her pornographic pictures on his phone for an extended period of time. Weaver did not know what to do in the situation and remained in her chair.

45. Hernandez then started discussing her maintenance records and pulled up information on his computer. Hernandez agreed to remove some of Weaver's maintenance charges from her account and put her on a repayment plan for the outstanding rent and maintenance charges.

46. Hernandez then told Weaver he wanted to show her something. Weaver began to stand up, thinking he was going to show her something about her maintenance records on the computer screen, but instead saw that Hernandez had unzipped his pants and was exposing himself to her. He asked her sexually explicit questions about his genitalia and she did not answer him. Before she left, Hernandez asked if she had any sexually explicit pictures of herself on her cell phone. He also told Weaver not to tell anyone what he did.

47. Weaver was shocked, embarrassed, and indignant, but did not tell Hernandez to stop for fear that Hernandez would not waive some of the maintenance charges and refuse to put her on a repayment plan for the outstanding rent and maintenance charges as he had promised.

48. Hernandez emailed the KCKHA Finance Department on August 14, 2013, and directed them to remove $60 of maintenance fees from Weaver's account.

49. Weaver reported the incident to Estelle on August 14, 2013, and Estelle told Cobb of Weaver's complaint on August 15, 2013. Cobb ignored Estelle's report of Hernandez's conduct towards Weaver.

50. On August 15, 2013, Weaver signed a repayment agreement with KCKHA agreeing to repay her outstanding balance in monthly installments. On August 21, 2013, the District Court of Wyandotte County, Kansas dismissed the Peaceable Entry and Forcible Detainer petition against Weaver.

51. During his meeting with Weaver about her unpaid fees, Hernandez implicitly conditioned the outcome of Weaver's grievance hearing regarding her possible eviction on her enduring his sexual conduct during the meeting in his office and/or otherwise engaging in sexual conduct with him.

52. Hernandez's sexual conduct towards Weaver was unwelcome and offensive, and was sufficiently severe or pervasive to have the effect of imposing different terms, conditions, or privileges of her housing arrangement with the KCKHA and interfering with her enjoyment of housing.

**Sexual Harassment of Other KCKHA Applicants and Participants by Hernandez**

53. On multiple occasions from approximately 2011 to 2013, Hernandez required other KCKHA applicants and residents who had appealed adverse housing decisions by KCKHA to endure unwelcome sexual comments and other unwelcome sexual conduct in order to secure a favorable decision on their appeals. Hernandez's conduct toward these women included unwelcome touching, comments about their bodies, questions about their sexual partners, gestures indicating his sexual arousal, and comments about his and others' genitalia.

54. Hernandez's conduct as described above in paragraph 52 was unwelcome and offensive, and was sufficiently severe or pervasive to have the effect of imposing different terms, conditions, or privileges of the women's housing arrangement with the KCKHA and of interfering with their enjoyment of housing.

55. Hernandez's discriminatory housing practices described above in paragraphs 17-53 occurred while he was exercising his authority as the Administrative Coordinator and Hearing Officer for the KCKHA.

56. KCKHA is liable for the discriminatory housing practices of its agent, Victor L. Hernandez. KCKHA knew or should have known of Hernandez's discriminatory housing practices, had the authority to take preventive and corrective action, and failed to take reasonable preventive or corrective measures to prevent or redress Hernandez's conduct.

57. KCKHA terminated Hernandez on January 6, 2014, after Hernandez admitted to KCKHA Executive Director Tom Scott that he engaged in improper sexual conduct towards Davis and acknowledged that the allegations in Davis's HUD complaint were true.

### Sexual Harassment of KCKHA Applicants and Participants by Estelle

58. In his capacity as Property Manager, KCKHA provided Estelle with the actual or apparent authority to make decisions on behalf of KCKHA on a participant's continued occupancy in public housing.

59. As a Property Manager, Estelle harassed multiple participants and at least one applicant by explicitly conditioning housing benefits on receipt of sexual favors and/or entering into a relationship with him.

60. As a Property Manager, Estelle made repeated unwelcome and offensive sexual advances towards multiple participants and at least one applicant.

61. Estelle's conduct towards these women was sufficiently severe or pervasive to have the effect of imposing different terms, conditions, or privileges of their housing arrangement with the KCKHA and interfering with their enjoyment of housing.

### Sexual Harassment of KCKHA Participants by Cobb

62. In his capacity as Director of KCKHA's Housing Management Department, KCKHA provided Cobb with the actual or apparent authority to make decisions on behalf of KCKHA on an applicant's admission to the public housing program and on a participant's continued occupancy in public housing.

63. As Director, Cobb harassed at least two women by explicitly conditioning housing benefits in return for sexual favors and/or entering into a relationship with him.

64. As Director, Cobb made repeated unwelcome and offensive sexual advances towards these participants.

65. Cobb's conduct towards these women was sufficiently severe or pervasive to have the effect of imposing different terms, conditions, or privileges of their housing arrangement with the KCKHA and interfering with their enjoyment of housing.

### Sexual Harassment By Other KCKHA Employees

66. Multiple other KCKHA employees engaged in sexual harassment of public housing participants at KCKHA properties and/or in the public housing participants' units.

67. KCKHA management was aware of at least some of these incidents of sexual harassment against applicants and participants involving KCKHA employees.

68. KCKHA management ignored complaints of sexual harassment of participants by KCKHA employees and failed to act upon them.

### HUD COMPLAINTS AND CHARGE OF DISCRIMINATION

69. Pursuant to 42 U.S.C. § 3610(a), Davis and Weaver filed timely complaints of discrimination on the basis of sex against the Defendants with HUD.

70. Pursuant to 42 U.S.C. §§ 3610(a) and (b), the Secretary of HUD:

> a. Conducted and completed an investigation of Davis's complaint, attempted conciliation without success, and prepared final investigative report; and
>
> b. Conducted and completed an investigation of Weaver's complaint, approved a conciliation agreement between KCKHA and Weaver, attempted conciliation between Weaver and Hernandez without success, and prepared a final investigative report.

Based upon the information gathered in the investigation, the Secretary, pursuant to 42 U.S.C. § 3610(g)(1), determined that reasonable cause existed to believe that Hernandez engaged in illegal discriminatory housing practices against Davis and Weaver and KCKHA engaged in illegal discriminatory housing practices against Davis.

71. Therefore, on September 15, 2015, the Secretary issued a Charge of Discrimination, pursuant to 42 U.S.C. § 3610(g)(2)(A), against KCKHA on behalf of Davis and against Hernandez on behalf of Davis and Weaver.

72. On September 25, 2015, Davis elected to have the claims asserted in the Charge of Discrimination resolved in a civil action pursuant to 42 U.S.C. § 3612(a).

73. On September 28, 2015, an Administrative Law Judge issued a Notice of Election to Proceed in United States Federal District Court and terminated the administrative proceeding on the Charge of Discrimination.

74. On September 29, 2015, the Secretary of HUD authorized the Attorney General to commence a civil action, pursuant to 42 U.S.C. § 3612(o).

## COUNT I

75. Paragraphs 9 through 74 are realleged and incorporated by reference as though fully set forth herein. By the actions and statements referred to in the foregoing paragraphs, Defendants have:

a. Discriminated in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of sex, in violation of 42 U.S.C. § 3604(b);

b. Made statements with respect to the rental of a dwelling that indicated a preference, limitation, or discrimination based on sex, in violation of 42 U.S.C. § 3604(c); and

c. Coerced, intimidated, threatened, or interfered with a person in the exercise or enjoyment of, or on account of her having exercised or enjoyed, the rights granted or protected by section 804 of the Fair Housing Act, in violation of 42 U.S.C. § 3617.

76. Davis and Weaver are "aggrieved persons" as defined in 42 U.S.C. § 3602(i).

77. Davis has suffered damages as a result of Defendants KCKHA's and Hernandez's discriminatory conduct.

78. Weaver has suffered damages as a result of Defendants KCKHA's, Hernandez's and Estelle's conduct.

79. Defendants' discriminatory conduct was intentional, willful, and/or taken in reckless disregard of the rights of others.

## COUNT II

80. Paragraphs 9 through 79 are realleged and incorporated by reference as though fully set forth herein. By the actions and statements referred to in the foregoing paragraphs, Defendants have engaged in:

    a. A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, in violation of 42 U.S.C. § 3614(a); or

b. A denial to a group of persons of rights granted by the Fair Housing Act, where such denial raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

81. In addition to Davis and Weaver, other public housing applicants and participants were subjected to KCKHA employees' unwelcome sexual conduct or were otherwise harmed by such conduct. Such persons are "aggrieved persons" as defined in 42 U.S.C. § 3602(i), and have suffered damages as a result of Defendants' discriminatory conduct.

82. Defendants' discriminatory conduct was intentional, willful, and/or taken in reckless disregard of the rights of others.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that this Court enter an order that:

a. Declares that Defendants' actions, policies, and practices, as alleged herein, violate the Fair Housing Act;

b. Enjoins Defendants, their agents, employees, and successors, and all other persons in active concert or participation with them, from:

  i. Discriminating on the basis of sex, including engaging in sexual harassment, in any aspect of the rental or lease of a dwelling;

  ii. Discriminating in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, on the basis of sex;

  iii. Stating any preference, limitation, or discrimination on the basis of sex;

  iv. Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under the Fair Housing Act;

v. Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendants' past unlawful practices to the position they would have been in but for the discriminatory conduct; and

vi. Failing or refusing to take such affirmative steps as may be necessary to prevent recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendants' unlawful housing practices;

c. Requires Defendants, pursuant to 42 U.S.C. §§ 3612(o)(3) and 3613(c)(1), to pay monetary damages to Davis;

d. Requires Hernandez and Estelle, pursuant to 42 U.S.C. §§ 3612(o)(3) and 3613(c)(1), to pay monetary damages to Weaver;

e. Awards monetary damages, pursuant to 42 U.S.C. § 3614(d)(1)(B), to each additional person aggrieved by Defendants' discriminatory housing practices; and

f. Assesses a civil penalty against each Defendant in order to vindicate the public interest, pursuant to 42 U.S.C. § 3614(d)(1)(C) and 28 C.F.R. § 85.3(b)(3).

The United States further prays for such additional relief as the interests of justice may require.

## JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## REQUEST FOR PLACE OF TRIAL

The plaintiff, United States of America, requests that the above-entitled case be placed on the docket for trial in Kansas City, Kansas.

Dated: September 22, 2016

|  |  |
|---|---|
|  | LORETTA E. LYNCH<br>Attorney General |
| TOM BEALL<br>Acting United States Attorney<br>District of Kansas | VANITA GUPTA<br>Principal Deputy Assistant Attorney General<br>Civil Rights Division |
| /s/ Jon P. Fleenor<br>JON P. FLEENOR #14002<br>Assistant United States Attorney<br>500 State Avenue, Suite 360<br>Kansas City, Kansas 66101<br>Phone: (913) 551-6531<br>Fax: (913) 551-6541<br>E-mail: Jon.Fleenor@usdoj.gov | SAMEENA SHINA MAJEED<br>Chief<br><br>/s/ Ronald H. Lee<br>CATHERINE A. BENDOR<br>Deputy Chief<br>RONALD H. LEE (DC SBN 499614)<br>AMIE S. MURPHY (NY SBN 4147401)<br>Trial Attorneys<br>Housing and Civil Enforcement Section<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Avenue NW<br>Northwestern Building, 7th Floor<br>Washington, DC  20530<br>Phone: (202) 616-1892<br>Fax: (202) 514-1116<br>Ronald.Lee@usdoj.gov |